UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JAMES WILLIAM BECHTOLD and | ) | Case No. 10-30013 |
| CAREN LEE BECHTOLD, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| LARRY M. STILES, Trustee for the | ) | |
| Bankruptcy Estate of James William | ) | |
| Bechtold and Caren Lee Bechtold, | ) | |
| | ) | Adversary Proceeding No. 10-3255 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ANSWER |
| JAMES WILLIAM BECHTOLD and | ) | (Amended to Include Exhibits) |
| CAREN LEE BECHTOLD, | ) | |
| | ) | |
| Defendants. | ) | |

Defendants (also referred to herein as "Debtors"), answering Plaintiff's complaint, say and allege as follows:

1. Paragraph 1 is admitted.

2. Paragraph 2 is admitted.

3. Paragraph 3 is admitted.

4. Paragraph 4 is admitted.

5. Paragraph 5 is admitted.

6. Answering Paragraph 6, it is admitted that through mistake and inadvertence, the

   Debtors failed to disclose that they were indebted to Jeff Shaheen in the amount of

1

$25,000. Based upon the Rule 2004 examinations of the Debtors, it is unclear whether the female Debtor even knew about the loan (Rule 2004 Examination of James William Bechtold at p. 34). The Debtors filed an amendment to their Schedule F to list this creditor prior to their Rule 2004 examinations.

7. Answering Paragraph 7, it is admitted that the Debtors stated that they were indebted to Lorelei Thompson in the amount of $100,000. However, it is denied that they "falsely" stated that they were indebted. It further is denied that the Debtors falsely testified under oath during their 2004 examinations on May 24, 2010 that Lorelei Thompson had forgiven the debt prior to their bankruptcy filing. It is admitted that Lorelei Thompson filed a Satisfaction of Deed of Trust with the Office of the Register of Deeds of Mecklenburg County, North Carolina. It is admitted that the Debtors testified at their Rule 2004 Examinations about Lorelei Thompson as shown in Exhibits A (from Caren Bechtold's Rule 2004 Examination) and B (from James Bechtold's Rule 2004 Examination). In addition, the Debtors apparently had some counsel from their former attorney, Angela M. Heath, regarding the debt. Attached as Exhibit C is a copy of the draft of the Debtors' Schedule D which was prepared by their former attorney sometime in the fall of 2009. Except as specifically admitted, Paragraph 7 is denied.

8. The Debtors answer the sub-parts of Paragraph 8 of the complaint as follows:
    a. Answering Paragraph 8(a), it is admitted that the Debtors did not disclose the transfer of the boat, through mistake and/or inadvertence. The Debtors swapped the boat with Paul Kidd in an even trade for the real estate located

in Berry County, Missouri. The Debtors lack knowledge or information sufficient to form a belief as to the value of the boat that was transferred.

b. Answering Paragraph 8(b), it is denied that the money was property of the Debtors, or that it was ever intended to be the property of the Debtors. Rather, the money was given to the male Debtor by Danny Edwards, a friend and former creditor of the Debtors, with instructions to pay the same money to Heidi Bonilla, the daughter of Danny Edwards. The Debtors, in essence, acted as trustees.

c. Answering Paragraph 8( c), it is denied that the money was property of the Debtors, or that it was ever intended to be the property of the Debtors. Rather, the money was given to the male Debtor by Danny Edwards, a friend and former creditor of the Debtors, with instructions to pay the same money to Heidi Bonilla, the daughter of Danny Edwards. The Debtors, in essence, acted as trustees.

d. Answering Paragraph 8(d), it is denied that the money was property of the Debtors, or that it was ever intended to be the property of the Debtors. Rather, the money was lent to Jeffrey Bechtold, the Debtors' son, by the female Debtor's brother, Neal Thompson, as explained in the male Debtor's Rule 2004 Examination, see p. 39, and the female Debtor's Rule 2004 Examination, see pp. 45 – 47, and the Debtors merely served as a conduit of the money.

e. Answering Paragraph 8(e), it is denied that the money was property of the Debtors, or that it was ever intended to be the property of the Debtors. Rather, the money was lent to Tim Bechtold, the Debtors' son, by the female Debtor's brother, Neal Thompson, as explained in the male Debtor's Rule 2004 Examination, see p. 39, and the female Debtor's Rule 2004 Examination, see pp. 45 – 47, and the Debtors merely served as a conduit of the money.

f. Answering Paragraph 8(f), it is admitted that the Deed of Trust was not listed on the Statement of Financial Affairs. As shown in Paragraph 7 above, the Debtors made their previous attorney, Ms. Heath, aware of the Deed of Trust, as shown in the attached Exhibit C. Except as specifically admitted, Paragraph 8(f) is denied.

g. Answering Paragraph 8(g), it is admitted that the sale of the Rite Aid stock was not listed on the Statement of Financial Affairs. However, it appears that the Debtors did notify their former attorney, Angela M. Heath, of the sale of Rite Aid stock. Attached hereto as Exhibit D is a form that was used by the former law firm of Shuford Hunter, PLLC on which the prospective Debtor is directed to list income. As shown on Exhibit D, the Debtors did list the proceeds of the sale as "income," which should have alerted their former attorney to make sure that the sale was properly listed on the Statement of Financial Affairs. Except as specifically admitted, Paragraph 8(g) is denied.

  h. Answering Paragraph 8(h), it is admitted that the sale of the Rite Aid stock was not listed on the Statement of Financial Affairs. However, it appears that the Debtors did not notify their former attorney, Angela M. Heath, of the sale of Rite Aid stock. Attached hereto as Exhibit D is a form that was used by the former law firm of Shuford Hunter, PLLC, on which the prospective Debtor is directed to list income. As shown on Exhibit D, the Debtors did list the proceeds of the sale as "income," which should have alerted their former attorney to make sure that the sale was properly listed on the Statement of financial Affairs. Except as specifically admitted, Paragraph 8(h) is denied.

9. The Debtors answer the subparts of Paragraph 9 of the Complaint as follows:

  a. The $2,000.00, upon information and belief, was used to purchase a certified check to pay the former law firm of Shuford Hunter, PLLC for legal services. Therefore, the $2,000.00 was not a "payment to creditor."

  b. The $760.00, upon information and belief, was paid to Tim Bechtold either to help Tim Bechtold in his move to a new job and a new city (Richmond, Virginia), or as a repayment of a short term loan. At this point, the Debtors cannot remember which. Any failure to list this was unintentional.

  c. The $1,000.00, upon information and belief, was paid to Tim Bechtold either to help Tim Bechtold in his move to a new job and a new city (Richmond,

Virginia), or as a repayment of a short term loan. At this point, the Debtors cannot remember which. Any failure to list this was unintentional.

10. Answering Paragraph 10, it is admitted that the Debtors purchased approximately 53 acres of land in Missouri. It is denied that the purchase price was $71,000. Instead, the purchase price was a swap for a boat. It is admitted that the Debtors owed no money on the land.

11. Paragraph 11 is admitted. Mr. Cassidy had agreed to purchase the Missouri land. The Debtors were long-standing friends of his. The Debtors had been unable to sell the land, although it had been listed with a real estate agent. This was the first installment.

12. Paragraph 12 is admitted. This was the second installment.

13. Paragraph 13 is admitted. This was the third installment.

14. Paragraph 14 is admitted. However, as noted in Paragraph 16, the Deed was not recorded in Missouri until November 4, 2009.

15. Paragraph 15 is admitted. This was two-thirds of the fourth installment.

16. Paragraph 16 is admitted.

17. Paragraph 17 is admitted. This was the last third of the fourth installment.

18. Paragraph 18 is admitted upon information and belief. The Debtors had nothing to do with the timing of Mr. Cassidy's sale of the Missouri land to William Dummitt and William A. Crawford.

19. Paragraph 19 is admitted.

20. Paragraph 20 is admitted. Mr. Cassidy was under no obligation to give the Debtors any money.

21. Paragraph 21 is admitted.

22. Answering Paragraph 22, it is admitted that Mr. Cassidy, who was under no obligation to do so, having paid $36,000 for the land pre-petition, gave the net proceeds of the land transfer to the Debtors as a gift, except for $9,000, which Mr. Cassidy gave to JoAnne Monaghan as a gift.

23. Paragraph 23 is admitted. The male Debtor told his accountant that the amount was incorrect and that it needed to be fixed, but the accountant wanted to be paid for an amended return, and since it wouldn't make a difference as to the Debtors' tax situation, the Debtors did not file an amended return.

24. Paragraph 24 is denied.

25. Answering Paragraph 25, it is admitted that the Debtors used the proceeds of the sale of the land to Mr. Cassidy for $36,000 for their own benefit; that is, paying living expenses.

26. Paragraph 26 is denied.

27. Answering Paragraph 27, while it is admitted that the Debtors signed their bankruptcy petition under penalty of perjury, and under oath, they believed that their former attorney had competently prepared the bankruptcy petition and schedules. The Debtors had no intention of concealing anything from the Bankruptcy Court or their trustee. The Debtors have cooperated with their current

attorney and with the bankruptcy trustee and gave the trustee numerous documents at the trustee's request.

28. The Debtors reallege their answers to Paragraphs 1 – 27 by reference.

29. Paragraph 29 is denied.

30. Paragraph 30 is denied. The Defendants have been answering the Trustee's questions beginning in March, 2010. The Defendants always responded well within the deadlines given to them either by the Trustee or his attorney. Prior to the Rule 2004 examination, the Defendants submitted over 4,000 pieces of paper in a large box from which their financial condition or business transactions might be ascertained. The Trustee's attorney demanded delivery of the information in a very short period of time.

31. Paragraph 31 is denied.

32. Paragraph 32 is denied.

WHEREFORE, having answered the Complaint, the Debtors pray that the Court enter judgment in their favor; that the Court enter their discharge in bankruptcy, and that the Court grant such other and further relief as may be just and proper.

This 12 day of ~~October~~ Nov., 2010.

/s/ G. Martin Hunter
G. Martin Hunter, N.C. Bar # 13557
Attorney for the Debtors
301 S. McDowell Street, Suite 1014
Charlotte, NC 28204
Tel. 704.377.8764

8

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing answer, *amended to include exhibits* was served upon the attorney for the Trustee by CM/ECF electronic transmission this date.

This __12__ day of ~~October~~ *Nov*, 2010.

_G. Martin Hunter_
G. Martin Hunter, N.C. Bar # 13557
Attorney for the Debtors

**Page 33**

1  anywhere? Sign anything?
2  A.  I don't recall.
3  Q.  You mentioned that she had made other loans
4  to you over the years as well; is that correct?
5  A.  That's what I don't know, if it all got
6  lumped in -- because we did keep paying her the same
7  amount for years and years and years.
8  Q.  And you believe that after '97 she made
9  additional loans to you?
10  A.  Yes. I believe she did to help us with the
11  Bluff Point house.
12  Q.  Do you have any records of the dates and
13  amounts of those loans?
14  A.  No.
15  Q.  I believe in the Schedules it also lists a
16  loan owed to Norbert Bechtold.
17  A.  Right, that's Jim's dad. And he did the
18  same thing, loaned us an amount that we just paid on a
19  regular basis for the same amount of time. Because
20  they both helped us initially build our first house at
21  Hunters Pointe.
22  Q.  Did Mr. Bechtold loan additional monies to
23  you or your husband after that initial loan?
24  A.  No.
25  Q.  Do you know if that loan from

VERBATIM COURT REPORTING SERVICES
(704) 545-7441

**Page 34**

1  Norbert Bechtold was written down or memorialized in
2  paper in any way?
3  A.  I don't know.
4  Q.  Okay. It looks like that payment is
5  normally $1,445. Does that sound correct?
6  A.  That sounds right, yeah.
7  Q.  How long have you all been making that
8  payment?
9  A.  I believe that goes back to '97 too.
10  Q.  Do you know how that amount was determined?
11  A.  No, I don't.
12  Q.  How long have you been making the payments
13  to your mother of $2,141?
14  A.  I think as far back as '97 but I'm not sure.
15  Q.  It looks like in September of last year you
16  all sold a boat to William Mark?
17  A.  Yes.
18  Q.  What kind of boat was that?
19  A.  That's our pontoon boat.
20  Q.  And you sold it for $1,800?
21  A.  Yes.
22  Q.  How was that price determined?
23  A.  Just Jim talked to some consignment people
24  and found out what the going rate was because it's a
25  16 year old boat.

VERBATIM COURT REPORTING SERVICES
(704) 545-7441

**Page 35**

1  Q.  Were there any documents that were signed
2  for the sale of the boat, the pontoon boat?
3  A.  Yes, there were.
4  MR. TAYLOR:  Can we get copies of those?
5  MR. HUNTER:  Okay.
6  THE WITNESS:  They should be in there.
7  MR. TAYLOR:  I'll double check.
8  I'll let you know if I don't find them.
9  MR. HUNTER:  Okay.
10  Q.  Did you all know William Mark before he
11  bought the boat?
12  A.  Yes, we did.
13  Q.  And how did you know him?
14  A.  Jim grew up with him. He's a real good
15  friend from childhood, and he moved to Troutman from
16  Minnesota, and they wanted a boat.
17  (Comments off the record.)
18  Q.  Where does William Mark live?
19  A.  In Troutman, North Carolina.
20  Q.  Do you know his address?
21  A.  No, I don't.
22  Q.  Why were you all selling the pontoon boat?
23  A.  Just because we needed money.
24  Q.  Is your house on the lake?
25  A.  Yes, it is.

VERBATIM COURT REPORTING SERVICES
(704) 545-7441

**Page 36**

1  Q.  Where did you all keep the pontoon boat
2  before you sold it?
3  A.  It was at the clubhouse at our previous
4  neighborhood at the Harbour up in Mooresville.
5  Q.  Do you know where it is now?
6  A.  Yes. It's actually in our boat slip because
7  Bill sold it to the gentleman that lives across the
8  street from us now, and he keeps it in our slip because
9  he's not on the lake.
10  Q.  Does he pay you rent for that?
11  A.  No, he doesn't.
12  Q.  What's the gentleman's name that bought the
13  boat from Bill?
14  A.  Rick Blair, B-L-A-I-R, I believe.
15  Q.  Do you know how much Rick Blair paid Bill
16  for the boat?
17  A.  No, I don't.
18  Q.  Do you know when it was sold to Mr. Blair?
19  A.  Just a couple of months ago.
20  Q.  Did you all try to sell that boat on eBay?
21  A.  No, we didn't.
22  Q.  Why not?
23  A.  Just because we knew Bill was wanting one,
24  and he's such a good friend of ours.
25  Q.  Have you all sold anything else on eBay

VERBATIM COURT REPORTING SERVICES
(704) 545-7441

Exhibit A

29

1  18700 Bluff Point Road, and then we were going to give
2  it back to her when we sold the house, but that didn't
3  work out so well.
4  Q.  When you say you "invested it in the
5  property," what do you mean by "invested"?
6  A.  I mean we reconstructed a house. We
7  remodeled a house. The house that we are in right now
8  that was going to be a investment property. We were
9  going to remodel it and then sell it for a profit.
10  Q.  At the time, the Brewers were occupying the
11  house?
12  A.  Well, no. This was way before that. They
13  didn't rent it until we completed the house. We
14  remodeled the house to sell it, but then the market
15  crashed. We couldn't sell it, so we decided to try and
16  rent it.
17  Q.  Do you recall when you purchased the house?
18  A.  I don't know the exact date.
19  Q.  Do you think your mother made this loan to
20  you around the time you purchased the house?
21       MR. HUNTER:  If you know.
22  Q.  If you know.
23  A.  No, I don't know.
24  Q.  Sometime after you purchased the house?
25  A.  Yes. I believe it was after we purchased

30

1  the property.
2  Q.  Do you recall if she made the loan to you
3  before the Brewers moved into the house?
4  A.  Yes, she did.
5  Q.  Do you recall when the Brewers moved into
6  the house?
7  A.  It was in the middle of January -- sometime
8  in January of '09, I believe.
9  Q.  I apologize. I wasn't trying to trick you.
10  I actually didn't realize it was attached as the last
11  page to this document. If you can look at the last
12  page there is a Promissory Note dated April 1, 2008 for
13  $100,000 --
14  A.  Right.
15  Q.  -- to your mother. Does that refresh your
16  memory as to the transaction?
17  A.  I see, because it was 2008. I just know
18  she's been so generous in giving us money, but I don't
19  recall when or what each thing was exactly for.
20  Q.  Then she signed, on November 1, 2009, a
21  Satisfaction of the Promissory Note?
22  A.  Then that's probably -- I just know that she
23  had said that she didn't want us to have to worry about
24  it. Once she found out that we were going to declare
25  bankruptcy, she just said, "I don't want this to be a

31

1  part of that, and I will exclude it."
2       So that's all I remember.
3  Q.  Do you recall, did you all pay her $100,000
4  back around November, 2009?
5  A.  No, we didn't.
6  Q.  Did she say that you no longer owe it?
7  A.  Right.
8  Q.  She was forgiving the loan?
9  A.  Right, right, because of our whole
10  situation.
11  Q.  Why was it that she was doing that?
12  A.  Just because she knew that we didn't have it
13  and knew what our whole situation was. She said she
14  was okay without it, and she said instead of giving it
15  to us after she passes, she would just rather let us
16  use it when we need it. The bankruptcy just kind of
17  made her very nervous, and she didn't want to have
18  anything to do with it.
19  Q.  What about the other money that you owe her?
20  Why didn't she treat that the same way?
21  A.  That, I don't know.
22       MR. HUNTER:  Can we go off the record for a
23  second?
24       MR. TAYLOR:  Yeah.
25       (Discussion off the record.)

32

1  Q.  Okay. Let's see. I believe in your
2  Schedules you show that you made payments to your
3  mother. I don't think we identified her on the record,
4  but her name is Lori Thompson; is that correct?
5  A.  Yes, correct.
6  Q.  And what's her full, legal name?
7  A.  Lorelei Enid -- it's E-N-I-D -- Thompson.
8  Q.  It shows that you were making regular
9  monthly payments to her of $2,141; is that correct?
10  A.  Yes, it is.
11  Q.  How was that amount determined?
12  A.  I don't know.
13  Q.  Were you involved in it in any way?
14  A.  I knew of it, but Jim was the one that
15  handled all of that.
16  Q.  Okay.
17  A.  That was just the monthly payment that she
18  needed to make, and we paid it for her, the interest
19  only I believe.
20  Q.  Okay. Do you recall, is there any document
21  saying that you're supposed to pay her $2,141 a month?
22  A.  I don't know.
23  Q.  Okay. When she made you the loan back in
24  '97, originally, did you all memorialize that with a
25  paper writing of some sort? Did you write it down

Exhibit A

49

1  Q.  I'm sorry. What was the base amount you
2  said?
3  A.  $2,141 is the base amount. And then
4  obviously the months that we couldn't afford to pay her
5  are missing. But the $191 is for interest on an equity
6  line she took out to lend us to finish the house.
7  Q.  And that was a $100,000 loan?
8  A.  (Nods head up and down.)
9  Q.  Has that been repaid?
10 A.  No.
11 Q.  What's the status of that loan at that time?
12 A.  Well, we secured it because she helped us
13 build the house. And when we told her about the
14 bankruptcy and everything, she said she didn't want to
15 be a part of it -- she's 77 years old -- and just
16 cancelled it for us and said, "If you ever have it, pay
17 it back. Otherwise don't worry about it."
18 Q.  So she forgave the loan, in essence? Is
19 that a fair statement?
20 A.  Yeah, but I still want to pay her the
21 interest payments as we can. And I'd still like to pay
22 it back someday. It's not fair to her that she got
23 caught up in my bad real estate decision.
24 Q.  If you could look at Exhibit 5. Does that
25 relate to the $100,000 loan?

VERBATIM COURT REPORTING SERVICES
(704) 545-7441

50

1  A.  It does.
2  Q.  What are those documents?
3  A.  I don't know the correct terminology, but it
4  is a secured interest in the house and then the Note
5  behind it.
6  Q.  The Note appears, on the face of it, to be
7  dated April 1, 2008; is that correct?
8  A.  Right.
9  Q.  And then the mortgage looks like it was
10 recorded in June of 2009.
11 A.  Yeah. I mean, when we borrowed the money,
12 we thought it was going to be a short-term thing, we'll
13 sell it. That's right when we brought it to market in
14 April of '08. There was never any intention for this
15 to go on longer than a few weeks.
16     And when it went on and the market kept
17 getting worse I said, "I want to protect you. If I get
18 hit by a bus, I want to make sure you get paid." But
19 we could never sell it.
20 Q.  And you gave her the Deed of Trust in
21 June of 2009 to secure the payment of it?
22 A.  Right.
23 Q.  And then she's marked both the Promissory
24 Note and the Deed of Trust as being Satisfied on
25 November 1, 2009?

VERBATIM COURT REPORTING SERVICES
(704) 545-7441

51

1  A.  Right.
2  Q.  That was when she decided to forgive the
3  loan?
4  A.  Right.
5  Q.  Do you know, has the notice of Satisfaction
6  of the Deed of Trust been recorded with Mecklenburg
7  County?
8  A.  Everything I've gotten back, you have a copy
9  of.
10     MR. HUNTER:  It would get foreclosed soon if
11 it hadn't, anyway.
12     Can we take about a two-minute break?
13     MR. TAYLOR:  Yes.
14     (Break taken.)
15 Q.  Mr. Bechtold, in Exhibit 3, which relates to
16 your purchase of the Missouri land and the sale of your
17 boat, there are multiple dates involved in those
18 documents: The Deed itself recites a date of
19 June 26th, 2008; it appears that Mr. Kidd's signature
20 was notarized on September 26th, 2008; and then the
21 Bill of Sale for the boat is dated September 6th of
22 2008.
23     Do you know why the dates are different?
24 A.  Well, the 6th is when I flew out there to
25 look at the land and make sure it really existed, and

VERBATIM COURT REPORTING SERVICES
(704) 545-7441

52

1  we sat with the realtor and created this Bill of Sale
2  on that date. And it just took that long to prepare
3  the Deed, I guess. I don't know.
4  Q.  Okay. So it's possible the date at the top
5  may be a typo? Do you see across the top line it says,
6  "Made on this 26th day of June, 2008." Do you see
7  there (indicating)? But it was signed September 26th.
8  A.  That's saying that he gave me the land in
9  June?
10 Q.  That's the date of the Deed.
11 A.  Well, that's wrong. Because I never even
12 knew this guy until a week before I flew out there and
13 talked to him.
14 Q.  This may be a drafting error.
15 A.  That's inaccurate.
16 Q.  Who prepared the Bill of Sale of the marine
17 vessel?
18 A.  Paul Kidd and I sat there and filled it out.
19 I took a blank with me, hoping that the deal would get
20 done. So we just filled it out at a restaurant.
21 Q.  Where did you get the blank?
22 A.  My brother gave it to me because he had used
23 it in years past when he had done similar boat flips.
24 Q.  Okay. And the sale of the boat to Mr. Kidd
25 was less than two years before you filed your

VERBATIM COURT REPORTING SERVICES
(704) 545-7441

Exhibit B

45

A. That was 5,400. But, again, that one had 300 feet of shoreline on the main channel. The lot alone was $1 million three years ago, I was told.

Q. In your Schedules you list payments to Norbert Bechtold during the prior year?

A. Uh-huh.

Q. What were those for?

A. Well, he lent us money. I've been borrowing money from him since the 1970s. When we bought our first house we borrowed money from him. We borrowed money to build the Mooresville house from him and Caren's mom. So we've been paying since 1997 a mortgage that they took out against their house to lend us money.

So those payments to both of them have been ongoing for 13 years and relate to mortgages that they've put on their house to help us.

Q. When you say "they" you're talking about the payments to --

A. Norbert and Lori Thompson.

Q. Lori Thompson being?

A. Caren's mother, my mother-in-law.

Q. Since '97 has there ever been a period of time where you didn't make the payments for a while?

A. Last year was the first time ever. We

46

couldn't pay Lori for five months, I think. You can see what we are doing just to survive, and we couldn't pay her for five months last year the $2,141 that we routinely send her every month.

Q. But prior to last year you paid every month?

A. Uh-huh. I think we sent copies to you going all the way back to '97, right after we filed.

Q. '97 or 2007?

A. When we filed, we gave Angela -- who is no longer with the firm, I hope they still have it -- we gave her records going back to 1997 of payments.

THE WITNESS: I thought it was because you had requested them.

MR. TAYLOR: You probably didn't ask that far back.

MR. STILES: No, I didn't.

MR. HUNTER: "This shows a history from 1997 for monies we've been paying to Lorelei Thompson and Norbert Bechtold."

It goes back forever.

MR. TAYLOR: We'll mark these as 19.
We've got some of them, I know that.
(Exhibit 19 was marked for identification.)

THE WITNESS: You asked specifically for the last 14 months or so, and then we did it again. We had

VERBATIM COURT REPORTING SERVICES
(704) 545-7441

47

to do it two or three times during this process, but that one goes all the way back.

Q. I'm going to hand you an exhibit that's been marked as Number 19 -- and you can confirm this for me -- but I'll represent to you it's copies of checks payable to Norbert Bechtold, it looks like going back to December, 2008.

If you'll look at those for me and tell me if that's accurate.

A. Yes, it is.

Q. And the payments vary a little bit. Do you know why they vary a little bit?

A. We had joined a network marketing company that required us to sell product outside the house. So the base payment is $1,430 and it changed to $1,445 because I'm reimbursing him for a little product that he's buying so that we satisfied our quota.

Q. I see. Okay. the base amount is how much?

A. $1,430.

Q. And then one of them is for $1,495, I think. Is that just more product reimbursement?

MR. HUNTER: There's a $1,461 where he's got $1,430 plus $31, and then says, "Hi Dad"; and then there's one for $1,445 where he's got $1,430 plus $15.

THE WITNESS: Right.

48

MR. HUNTER: And another $1,430 plus $15.

THE WITNESS: The one from September has $50. I was looking into his Social Security to see if I could increase his Social Security, so we bought a financial journal that I repaid him $50 for.

That's why it says, "Business Idea." We thought we were going to be able to help him and his friends increase their Social Security payments, but it turned out to be a scam of course.

MR. TAYLOR: Mark this as 20.
(Exhibit 20 was marked for identification.)

Q. I'm going to hand you an exhibit that's a groups of checks I believe payable to Lori Thompson. Are these payments on the loan to your mother-in-law that you were describing?

A. Correct.

Q. And it looks like the ones we have go back to December, 2008.

A. Yeah. The base amount is $2,141 for monies going way back to when we built the house and bought the business.

And then when she lent us another $100,000 to finish that house in '08, she took out an equity line on her house, and that's what the interest-only $191 payments are.

VERBATIM COURT REPORTING SERVICES
(704) 545-7441

Exhibit B

(12/07)

nes William Bechtold,
aren Lee Bechtold                                                         Case No. _____

Debtors

# SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of
of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided
debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and
security interests.
List creditors in alphabetical order to the extent practicable. If a minor child is a creditor, the child's initials and the name and address of the child's parent or
ardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured
reditors will not fit on this page, use the continuation sheet provided.
If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor",include the entity on the appropriate
chedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be
iable on each claim by placing an "H", "W", "J", or "C" in the column labeled "Husband, Wife, Joint, or Community".
If the claim is contingent, place an "X" in the column labeled "Contingent". If the claim is unliquidated, place an "X" in the column labeled "Unliquidated". If the
claim is disputed, place an "X" in the column labeled "Disputed". (You may need to place an "X" in more than one of these three columns.)
Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the la:
heet of the completed schedule. Report the total from the column labeled "Amount of Claim" also on the Summary of Schedules and, if the debtor is an individual
rimarily consumer debts, report the total from the column labeled "Unsecured Portion" on the Statistical Summary of Certain Liabilities and Related Data.
☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | Husband, Wife, Joint, or Community H/W/J/C | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| count No. xxxxxx2663<br><br>erican Home Mortgage<br>Box 631730<br>ng, TX 75063-1730 | | J | 09/2005<br>Deed of Trust<br>Former residence 141 Hunters Pointe Lane Mooresville, NC (tax value $1,521,950; market value is Ds best estimate given market & recent sales in area) (foreclosure pending; Ds will surrender) (Ds are in process of moving<br>Value $   1,100,000.00 | | | | 1,212,000.00 | 112,000.00 |
| ount No. xxxxxx4305<br><br>ora Loan Service<br>50 Park Meadows Dr.<br>eton, CO 80124 | | J | 06/2007<br>Deed of Trust<br>Residence 18700 Bluff Point Rd. Cornelius, NC (tax value $817,900; market value is based on recent realtor's appraisal) (recently rented by Ds, but Ds are in the process of moving into this home with intent to make this their<br>Value $   750,000.00 | | | | 659,594.00 | 0.00 |
| ount No. xxxxxxxxxx-5998<br><br>T Loan Services<br>Office Box 2306<br>on, NC 27894-2306 | | J | 08/26/2008<br>Deed of Trust<br>Residence 18700 Bluff Point Rd. Cornelius, NC (tax value $817,900; market value is based on recent realtor's appraisal) (recently rented by Ds, but Ds are in the process of moving into this home with intent to make this their<br>Value $   750,000.00 | | | | 80,000.00 | 0.00 |
| ount No.<br><br>lei E. Thompson<br>Cherry Lane<br>brook, IL 60062 | | J | 04/2008; recorded 06/2009<br>Deed of Trust<br>Residence 18700 Bluff Point Rd. Cornelius, NC (tax value $817,900; market value is based on recent realtor's appraisal) (recently rented by Ds, but Ds are in the process of moving into this home with intent to make this their<br>Value $   750,000.00 | | | | 100,000.00 *hindrance* | 89,594.00 |
| _ continuation sheets attached | | | Subtotal (Total of this page) | | | | 2,051,594.00 | 201,594.00 |

ht (c) 1996-2009 - Best Case Solutions - Evanston, IL - (800) 492-8037



Exhibit C

Best Case Bankruptcy

List every payment received in the month stated. If income came from payroll, attach any paycheck stubs in your possession, for this month.

_7_, 200_9_

Source:                                                    Gross Income:

Employment:    Farvrd Hinton                                  242
               Buy Local Direc.                              1,224

Retirement/
Pension:

Investments:   Stk Investment Sale                          10,700

Rental Income: Cornelius Hime                                2,700

Gifts/Family
Contribution:

               Sons' Repayments
               for Medical Ins                                 885
               and Car Pymts

Other Income:

Your bills paid by another:

Exhibit D

List every payment received in the month stated. If income came from payroll, attach any paycheck stubs in your possession, for this month.

_____ 6 _____, 200 9

| | Source: | Gross Income: |
|---|---|---|
| Employment: | Fortune Hi-Tech | 233 |
| Retirement/Pension: | | |
| Investments: | Stock Investment Sale | 5,000 |
| Rental Income: | Cornelius Hart | 2,700 |
| Gifts/Family Contribution: | Son Repayment of Insurance | 1,000 |
| Other Income: | | |
| Your bills paid by another: | | |

Exhibit D